509 So.2d 895 (1987)
BFGOODRICH, INC.
v.
Bobby TAYLOR.
No. 56706.
Supreme Court of Mississippi.
June 3, 1987.
*896 James E. Price, Price, Krohn & McLemore, Corinth, for appellant.
Duncan Lott, Langston, Lott & Langston, Booneville, for appellee.
Before HAWKINS, P.J., and PRATHER and GRIFFIN, JJ.
HAWKINS, Presiding Justice, for the Court:
BFGoodrich, Inc., appeals from a jury verdict and judgment in favor of Bobby Taylor for $250,000 in the circuit court of Prentiss County.
The only issue we address on appeal is the sufficiency of the evidence to support a finding a liability and the amount of the award.
Finding no error, we affirm.

FACTS
BFGoodrich, Inc., a New York corporation, is a major manufacturer of motor vehicle tires. One of Goodrich's plants, located in Miami, Oklahoma, employs about 2,000 personnel, operates on three shifts, and has approximately 40 acres under one roof.
One of the products of the Oklahoma plant are farm tractor tires. In November, 1978, this plant manufactured the tire involved in this case, namely: a 16 inch Co-Op tri-rib tractor front tire, Serial No. Y606B2K3061. This tire was sold and delivered in a shipment to Universal Co-Operatives, a Wisconsin corporation, which in turn sold and delivered the tire to MFC Services (AAL), a multi-state cooperative wholesaler, which in turn on January 2, 1979, shipped and sold the tire to Prentiss County Co-Op, a local cooperative.
Either that day or shortly thereafter the Prentiss County Co-Op sold this tire and another of the same size to Marliss Thornton, a resident of Prentiss County. The tires were put into the bed of Thornton's pickup truck, where they remained for several days. On or about January 16, Thornton *897 took the two front rims off his farm tractor together with the two tires to a filling station in Marietta, a small community in Prentiss County. The station was owned and operated by Bobby Taylor, plaintiff herein, who was to mount the new tires on the rims.[1]
The tires had pasted on them their description and the following safety precautions:
IMPORTANT SAFETY PRECAUTIONS!
(1) Be sure rim and tube are proper size for tire. (2) Remove rust deposits from rim wall and rim flange by buffing or wire brushing. (3) Centering tire and tube and lubricating both beads and rim with approved rubber lubricant or thin solution of vegetable oil soap are extremely important to prevent bead damage. (4) use remote control inflation equipment. (For safety inflation cage is recommended.) Never stand in front of or over the tire and wheel when inflating. (5) Do not exceed 35 pounds pressure when sealing tire beads to rim. (6) After beads have seated properly, remove valve core and completely deflate tire. Reinsert valve core and reinflate to recommended air pressure. (7) WARNING: Failure to observe these precautions may cause bead breakage or other failures resulting in possible serious or fatal injury.
(Vol. I., p. 139)
Using his machine, Taylor mounted one of the tires on the rim without incident.
Taylor described his machine as a "flat rig," a "mount" where he fixed flats. Photographs of the machine in the record show it to be an instrument familiar at filling stations and tire stores where tires are sold, mounted and repaired. Its base is circular, and approximately two feet high is a circular metal platform with a metal spindle approximately 12 inches long in the center. It has other devices which are used to seat as well as remove tires from the rims.
The portion of the machine known as the "bead breaker" sticks out a few inches further from the diameter of the circular platform on which the tire sits. The bead breaker is used to pop the "bead" off when one takes a tire off of a wheel rim. The bead is the hard rim on the inside perimeter of a tire that holds the tire on the wheel rim.
Taylor removed the old tire from the rim. He took "30 weight" oil and a wire brush and applied the oil to the bead. He also brushed the rim with oil or grease to remove any rust. He put the tire and rim on the machine, and put the bottom bead onto the rim. He screwed a locking nut onto the spindle. He then inserted the tube into the tire and inflated the tube in order to "get the wrinkle out of the tube." At that time the valve stem had no core. Using the "bar" of the machine, Taylor then pried the upper bead of the tire onto the rim. Taylor then inserted air "where the tire would come up to the rim," and inserted the valve stem core. He then unscrewed the locking nut so that it would not be tight against the rim, with but three or four threads holding it. When he put the valve core in the stem, he gauged the tire to have between 18 and 20 pounds of pressure. He intended to put approximately 28 pounds of pressure in the tire. He was in the process of getting the air hose to put more air into the tire, and had his hand over the tire and rim when it blew out and hit his hand. Taylor testified the tire and rim went to the ceiling, and sounded like "dynamite."
The accident severely injured Taylor's hand. Billy Joe Barnes was standing outside the station some 60 feet away, and heard the "explosion, the racket." He went to the source of the sound and met Taylor coming out holding his hand, around which he had wrapped a rag. Barnes took *898 Taylor to the Baldwyn Hospital where Taylor had first aid administered before being taken to the North Mississippi Medical Center in Tupelo.
Shortly after the accident, someone in the community informed Taylor's brother, Guy, who lived approximately one-half mile from the station. Guy went to the station and saw someone who told him Taylor had been hurt, that a tire had blown up.
Guy went into the shop and found the tire still on the rim and lying beside the mounting machine. He could not tell whether anything was wrong with the tire, and put the tire and rim back on to the machine and screwed the locking nut on. He removed the top of the tire and took out the tube. The tube was "blowed out and splintered."
He took the tire back off the machine and examined it for defects on both sides, but saw none at the time.
He then laid the tire back onto the tube, and where the tube had burst, he pushed down on the underside of the tire and discovered a cut approximately 2 1/2 inches in length. He threw the inner tube away.
Guy remained at the station the rest of the day and closed the business. He took the tire and rim to his home, and kept it stored there, except when he took it to the hospital two days later for Taylor to look at it.
Taylor employed a law firm in Booneville to represent him, who in turn retained the services of Dr. Lane Richard (Rick) Avent, a professor in the civil engineering department at Mississippi State University. Avent taught the behavior of various kinds of structures and materials under static (slowly applied) or dynamic (suddenly applied) forces.
Avent first saw the tire and rim in the law firm's Booneville office in April, 1979. Taylor's attorney Langston informed Avent what Taylor had related. Although Avent had been told of the cut, when he looked at the tire he did not notice it until a second look. The cut was a smooth cut which appeared to have been made by a knife.
Avent also inspected the tire mounting device at the station. He noticed a chip off the spindle at the top threads, but he could screw the nut on. Other than this, the machine appeared normal.
Taylor testified at trial that the threads in the spindle had been stripped by the accident and he had to replace the spindle. There is thus some discrepancy between Taylor, his brother Guy and Avent.
Avent took the tire and rim to the university in Starkville. He said the cut was smooth, approximately 2 1/2 inches in length and appeared to have been made with a sharp knife. Avent ran a series of tests with the tire and a new rim, as well as with the rim involved in the accident. He also used another tire. X-rays and numerous photographs were made.
On the tests Avent noticed that when the tire was inflated the tube would extrude outside the tire and eventually explode. With the tire laying in the open and the cut on the top side, a tube blowout did not move the tire. With the cut on the bottom, while the tire was in the open, a blowout lifted the tire to a 45° angle.
Four tests were also made on a tire rack of the same type Taylor had used. Two blow outs were induced with the cut away from the bead breaker, and a third with the cut directly above the bead breaker of the machine. The bead breaker restricted the inner tube's extrusion from the tire. On the third test the force was significantly greater.
According to Avent, the accident occurred because the tire was mounted with the cut side down, the tube extruded through the cut with the bead breaker acting as a backstop, and as a result the tire blew out and was propelled off the mounting machine.
In fairness to Goodrich, we note that the tests run by Avent are not highly supportive of a conclusion that the force described by Taylor would have occurred from inflating the tire to 20 or 30 pounds. On the other hand, the tests clearly demonstrated that every blowout occurred through the cut.
*899 Taylor's attorneys also retained George Edwards to examine the tire in July, 1983. Edwards has limited formal education, only completing the tenth or eleventh grade when he quit school to take over a tire retreading business when his father died. This was shortly before World War II, when Edwards went into the military service.
Following the war Edwards was employed by Gates Rubber Company in Denver, Colorado, in the technical division where he learned the tire manufacturing process, including testing of tires in the laboratories. He was then employed by Armstrong Rubber Company in the research and development department. He was in research and development in charge of the tread rubber division. In 1950 he was employed by a large retread plant. He then went into business as a consultant in retreading. In 1976 he was retained by Goodyear Rubber Company as a technical consultant, where he was employed for two years.
Following that Edwards started his own business as consultant, with a laboratory to test tires. Prior to trial he had examined over 500 tires for possible litigation cases.
From his examination of the tire, it was his opinion that the cut in the tire was made at the manufacturing plant. Edwards said that it was customary in tire manufacturing plants for an inspector to cut the sidewall of a defective tire with a "mill knife," in a manner very similar to the cut in this tire. Edwards said the tire was defective because of insufficient rubber at the beads and, in addition, the tire was defectively spliced.
Edwards was of the opinion the cut in the tire was the cause of the blowout and injury to Taylor, and that 18 to 20 pounds of pressure could cause the force Taylor described.
On October 15, 1981, Taylor filed suit in the circuit court of Prentiss County against Goodrich, Universal Co-Operatives and Prentiss County Co-Op.
On March 26, 1982, Goodrich answered interrogatories 100 and 101 previously propounded to it as follows:
INTERROGATORY NO. 100: Please state how the tire in question if found to be of a defective nature is marked or identified as a defective tire by the defendant.
ANSWER: Tires which are not suitable for use are scrapped.
INTERROGATORY NO. 101: After a tire is marked as a defective tire, please state the course that tire takes from the point of marking until its final destination or until it is finally destroyed.
ANSWER: See answer to Interrogatory No. 100.
Following a motion by Taylor's counsel for further answers to interrogatories, on December 21, 1982, Goodrich answered these interrogatories as follows:
INTERROGATORY NO. 100: (same as above)
ANSWER TO NO. 100: A tire which is found unsuitable for use by a hotline inspector is so identified with crayon and removed from the process flow by putting it on a special conveyor.
INTERROGATORY NO. 101: (same as above)
ANSWER: The tire goes to a hotline classifier via the special conveyor. He verifies the unsatisfactory condition and further identifies the tire by use of a special stamp. The tire is conveyed to the final classifier who cuts the sidewall and places the tire on a cart designated for scrap.
On March 8, 1983, plaintiff took the deposition of Albert Tribuzi, the corporate representative for Goodrich, and manager of its engineering analysis and consultation division. Tribuzi had also prepared the answers to the above interrogatories. Tribuzi testified at his deposition that the procedure for marking tires for destruction following stamping was to cut the sidewall. He said the cut would usually be about six inches in length.
On October 26, 1983, Goodrich amended its answer to Interrogatory No. 101 as follows:
ANSWER: The information contained in the supplemental answer to this interrogatory *900 filed in this cause in December 21, 1982, correctly describes the procedure that was followed at the Miami, Oklahoma, plant of BFGoodrich, Inc., after September 21, 1979. However, when the tire involved in this litigation was manufactured in November, 1978, at the Miami, Oklahoma, plant of BFGoodrich, Inc., the procedure for scrapping a blemished or defective front tractor tire, was as follows. The tire would go to a hotline classifier via the special conveyor. The hotline classifier would verify the unsatisfactory condition and would identify the tire by use of a special stamp. The tire would then be conveyed to the final classifier who might classify the tire further by use of a special stamp and who would cut the tire across the beads. The tire would then be placed on a cart designated for scrap; and when the scrap cart was full, it would be moved to the west dock and the tires hauled from there to the Miami Plant dump by Miami Plant personnel. Attached hereto and incorporated herein by reference is a copy of the pertinent portion of Miami Plant Waste Handling Procedure, Revision 1, dated August 26, 1977, which was in effect in November, 1978, and which continued to be in effect until September 21, 1979, describing the method used in scrapping tires such as the one involved in this litigation.
(R. 373-374)
As a result of his injury, Taylor was admitted to the Tupelo hospital on January 16 and discharged January 25, incurring a hospital bill of $2,429.75. He was treated by Drs. F. Mitchell Massey and Ben H. Buchanan of the orthopedic firm Tupelo Orthopedic Clinic. Taylor had massive injuries to his right hand at the base of his thumb and wrist involving the bones and ligaments. The scaphoid bone was crushed so badly it had to be removed. The first surgical procedure to treat his hand was unsuccessful and a second procedure was carried out. This procedure did not produce the results the doctors hoped for, either. Additional bones were removed and a proximal row carpectomy was performed. After his discharge from the hospital, Taylor was seen as an out-patient on February 2, February 19, March 5, March 22, April 4 and April 12, 1979, following which Taylor was referred to Dr. Milford of Campbell Clinic in Memphis, Tennessee, for consultation. Taylor was seen again by the Tupelo physicians on May 3, 1979, and after this on February 25, 1980, and April 12, 1983.
It was the opinion of Dr. Buchanan that Taylor had no use of his right hand except as a "hand holder," the human equivalent of a paperweight. His disability created a 90-100% dysfunction of his right arm, and a 54% dysfunction to the body as a whole in the opinion of Dr. Buchanan. The Tupelo physicians' bill was $1,328.50. In Memphis Taylor incurred a hospital bill at Baptist Memorial Hospital for $813.80 for three days' hospitalization, and a bill from Campbell Clinic for $539.50. Taylor's total medical expenses were $5,187.55.
Following his injury, Taylor attempted to operate his station without success, and later found employment as assistant shop foreman at an automobile agency in Fulton, which subsequently went out of business, a job he held at the time of trial. Because of his injury, he could not undertake the duties of shop foreman, because to do so he had to be able to write. His earnings as assistant foreman were $250 per week. Taylor was 27 years of age at the time of his injury, married and the father of two children.
There was a three-day trial in the circuit court beginning February 12, 1985. The facts were developed before the jury as above related, and we have also set out the testimony of Avent and Edwards before the jury. The plaintiff also offered as part of his evidence the interrogatories numbered 100 and 101, and the answers of Goodrich as above set forth. A pre-trial deposition of Tribuzi was offered into evidence before the jury.
Goodrich and Universal Co-Operatives were represented by the same counsel. When the plaintiff rested, the circuit judge sustained motions for directed verdict in favor of Universal Cooperative and the *901 Prentiss Co-Operative, holding there was no proof in the record of liability as to either of these defendants. The circuit judge overruled Goodrich's motion for a directed verdict.
Goodrich offered three witnesses in its defense, the first being Lee Hargrove.
Hargrove was 59 years of age, and had been working for Goodrich at its Oklahoma plant since 1946. He had worked in various capacities in the plant, and had been department manager since 1975. He described the manufacturing process and testified his department made the final inspection and final finish work on a tire in preparation for it to go into the warehouse for shipment to customers. He disputed Edwards' testimony that the bead on the tire was defective because it did not have a sufficient rubber covering, and likewise disputed Edwards' testimony that there was an open sidewall splice constituting another defect. He then explained why Edwards was mistaken in thinking the tire had been spliced where he had testified. He testified that tires serial numbers changed each week.
Hargrove stated that when a tire came through the curing process and got toward the end of the production line, a "hotline inspector" made an initial inspection of the tire for defects. If he found a defect, he marked it with a piece of chalk and put it over on a separate conveyor to go to what was called an "inspector buffer." This employee would look at the tire, and if the defect was of a minor nature, which could be corrected, he would do so and put it into the flow of production. If not he put the tire upon another conveyor to go to an individual called a "classifier."
The classifier would make the original determination whether to classify the tire as defective. Neither the buffer inspector nor the hotline inspector had authority to make this decision. If the classifier determined that it was not a defective tire, he would burn off the chalk mark with a hot iron and put his identification stamp on the tire before putting it back into process. The tire could not go back into process without the classifier putting his stamp on it. This stamp was put on with ink, and a different ink was used each shift. Hargrove saw no stamp or hot iron mark on this tire.
Hargrove then testified that in November, 1978, if the classifier decided that the tire was defective and could not go out to the public, it would be marked for scrap, putting a stamp on it with the date, and a figure "1" or a figure "2" behind the date to signify "scrap" or "blemish." He would then have put the tire on another conveyor that goes down to an employee called an "final classifier." The final classifier again inspected the tire and made the determination whether he agreed or disagreed with the original classifier. If he agreed that the tire was defective, then in November, 1978, the tire would have been destroyed.
According to Hargrove, in November, 1978, the plant destroyed tires by placing them on a big metal table and a "guillotine," a nine-inch cylinder blade, would cut across the tire. He then produced the copy of the handling procedure for the Miami Plant dated August 6, 1978, describing the procedure for destroying tires of this nature as follows: "Farm front tires are cut across the beads and moved to the west dock and hauled to the dump." Hargrove testified that "cut across the beads" was the guillotine process. Hargrove testified that the manner of destroying tires was changed in September, 1979, and thereafter tires were destroyed by a mill knife slicing the sidewall for approximately 18 inches. Hargrove also disputed the description of the type of knife used in destroying tires, which had been testified to by Edwards. He then testified that the 2 1/2" cut in the tire of the accident was considerably smaller than the cut that would have been made by a final classifier. Hargrove noted that there was nothing about this tire, either by stamping or marking to indicate that the Miami Plant had ever considered it defective.
Louie Brassart, 41 years of age, and a final classifier at the Miami Plant testified next. He had been in the production line for 15 years.
*902 He corroborated the testimony of Hargrove as to the method for classifying defective tires at the conclusion of the manufacturing process. He disputed Edwards' testimony that the tire was defective, and also disputed Edwards' testimony regarding the defective splice. He also disputed Edwards' description of the type of knife that was used. Brassart was not the classifier when the tire involved in this accident was manufactured in 1978, however, and did not know of his own knowledge the procedure to destroy this type of tire at the time of its manufacture. Brassart also testified that it took a considerable amount of force to get a knife through the sidewall, and it could not be cut accidentally without knowledge on the part of someone that he had cut the tire. He found nothing wrong with the bead on the tire involved in the accident. He also testified that the type of cut made to destroy tires by cutting along the sidewall was not the type of cut found on this particular tire.
The final witness for Goodrich was Albert Tribuzi, who held a bachelor's degree in mechanical engineering, as well as a master of science in technical education. He was 57 years of age, and was first employed by the Goodyear Rubber Company in Akron, Ohio, in March, 1952, as a tire engineer. He testified that there was no way to become a tire engineer solely by going to college, and each company trained its own engineers in tires. After his employment at Goodyear, Tribuzi went to work for Armstrong Rubber Company in Des Moines, Iowa, as a tire engineer. Following that he went to work for Goodrich. He had been tire construction manager in charge of all tires, a field engineer for tire testing, a quality control specialist, and had been in most of the technical aspects of tire manufacture. At the time he testified, he had been employed by Goodrich for 25 years.
Tribuzi had examined the tire in question in Akron, Ohio. He had measured the hardness, the bead width, and determined that there was no wear on the tire. He testified that they had put a piece of flap inside the tire where the cut was so the tube would not go through the hole, and had tried to duplicate the accident described by Taylor. They did not perform any tests that would be destructive to the tire, however.
Edwards had previously testified that the force of the blowout also bent the rim to the tire. The bead or "bead wires" to this tire had not been broken. Tribuzi testified that if there had been sufficient force to blow the tire sixteen feet into the air and bend the rim, at least one of the beads would have had to be blown off the rim. He further stated that if the bead had been blown over the flange of the rim, the bead bundle or bead wires inside would have broken completely. He said it was scientifically impossible to get an inflated tire off a solid rim without breaking the bead wires, because the function of the bead wires was to hold the tire to the wheel. He noted that the bead did not come off the tire when Avent made his tests, and testified it did not come off when he made his own tests. He said that the only way to generate enough force to duplicate an accident as described by Taylor was to have an explosion which blew the tire off the rim.
He also testified that some cord damage underneath the place on the tire where Edwards had claimed there was a defective splice was caused, in his opinion, by Guy Taylor's removing the tire from the rim.
It was Tribuzi's opinion that the accident could not have occurred as Taylor testified.
The jury returned a verdict for Taylor for $250,000, and Goodrich has appealed.

LAW
Goodrich strenuously urges the implausibility of Taylor's case as support for its contention no jury issue on liability was made and that it was entitled to a directed verdict. It questions Guy Taylor's discarding the inner tube, and argues the lack of probability of any force being generated as Taylor testified from an inner tube blowout, as well as the uncontradicted testimony that no factory marks showing the tire to be defective were on the tire. Goodrich also attacks Taylor's case as inherently weak, including insufficient chain of possession *903 to support Taylor's identification of the tire as the tire involved in the accident.
This Court, of course, is not the jury. The weight and credibility of the witnesses, primarily experts, was for the jury, who were free to accept or reject whatever part of their testimony they chose. See, e.g., Jackson v. Griffin, 390 So.2d 287 (Miss. 1980).
We have no problem that the tire offered into evidence was the tire involved in the accident.
The proof clearly shows Taylor suffered a severe injury in an accident involving this tire. The proof is also clear that in every test made, the problem with the tire was manifested through the cut. Therefore, the jury was well warranted in believing that whatever problem Taylor encountered with that tire that day resulted from the cut in it.
The jury may or may not have discounted the force as Taylor described, and as Avent and Edwards testified probably occurred, but they had ample evidence to support a conclusion that the accident and injury to Taylor came about because of the cut in the tire.
No expert testified that Taylor's failure to follow the printed instructions caused or contributed to the blowout. No doubt if Taylor had used the safety device recommended he might have avoided the injury.
The crucial question in this case open to serious challenge was whether the tire left the Goodrich plant with the cut in it.
There can be no doubt of this Court's commitment to the rule of strict liability against the manufacturer of defective products causing injury, as set out in § 402A of the American Law Institute's Restatement of Torts (2nd). Coca-Cola Bottling Co., Inc. v. Reeves, 486 So.2d 374 (Miss. 1986); Toliver v. General Motors Corp., 482 So.2d 213 (Miss. 1985); Thomas v. Munson Machinery Co. Inc., 463 So.2d 1044 (Miss. 1985); Early-Gary, Inc. v. Walters, 294 So.2d 181 (Miss. 1974); Walton v. Chrysler Motor Corp., 229 So.2d 568 (Miss. 1969); Ford Motor Co. v. Cockrell, 211 So.2d 833 (Miss. 1968); State Stove Manufacturing Co. v. Hodges, 189 So.2d 113 (Miss. 1966).
In Falstaff Brewing Corp. v. Williams, 234 So.2d 620, 623 (Miss. 1970), we quoted at length California Supreme Court Justice Traynor's opinion in Escola v. Coca-Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436 (1944), in which that jurist eloquently stated the basis for the rule.
One of the requisites for liability of the manufacturer, however, is set forth in § 402A(1)(b):
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
That is, from the evidence it must appear that the defect which was a proximate cause of the harm existed when the product left the possession of the manufacturer. State Stove Manufacturing Co. v. Hodges, supra; Early-Gary, Inc. v. Walters, supra; William Cooper and Nephews, Inc. v. Pevey, 317 So.2d 406 (Miss. 1975).
In this state, as in most states, the burden of proving that when the accident occurred there had been no substantial change in the condition in which the product left the manufacturer is upon the plaintiff. Ford Motor Co. v. Broadway, 374 So.2d 207 (Miss. 1979); Coca-Cola Bottling Co., Inc. v. Reeves, supra. This state does not follow the view in Greco v. Bucciconi Engineering Co., 407 F.2d 87 (Ct.App.3rd Pa. 1969), in which the Court of Appeals for the 3rd Circuit, following Pennsylvania law, permitted recovery on the theory that proof of a malfunction of machinery in and of itself proved a defect in manufacture. While it may be true that in many cases proof of a malfunction will in and of itself be proof of a defect in manufacture, it is not necessarily always the case.
This state also recognizes that direct proof of a defect at the time the product left the possession of the manufacturer is seldom available to a plaintiff, and this fact may be proved by circumstantial evidence. Falstaff Brewing Corp. v. *904 Williams, supra; Coca-Cola Bottling Co., Inc. v. Reeves, supra; 54 A.L.R.3rd 1079.
This Court has also had occasion to observe that it is only in rare and exceptional cases that a civil case depending upon circumstantial evidence should be taken from the jury. Smith v. Estate of Gilbert, 498 So.2d 823 (Miss. 1986); Douglas v. Great Atlantic & Pac. Tea Co., 405 So.2d 107 (Miss. 1981); Cameron v. Hootsell, 229 Miss. 80, 90 So.2d 195 (1956).
Whether the cut in the sidewall in this tire existed when the tire left the possession of Goodrich, or was made thereafter depends upon circumstantial evidence. That is, from the evidence in this case should the circuit judge have permitted the jury to pass upon the question: Is it more probable that the cut was made by Goodrich than someone else? Or, could the circuit judge have ruled as a matter of law that any inference as to when the cut was made was just as strong that it was made after the tire left Goodrich as that it was made before?
In the trial of this case, Goodrich never suggested that the cut in the tire was made by any third party. It does not suggest this on appeal. The only defense of Goodrich is that it did not make the cut.
We conclude sufficient evidence was adduced from which the jury could find the tire had been cut before it left the Goodrich plant. Goodrich had possession of the tire longer than anyone else; numerous employees, as well as machinery, no doubt handled it during the manufacturing process. It was a new tire, and was put on the rim less than three months following its manufacture. Goodrich employee Brassart testified that some force was necessary to make such a cut, suggesting it was deliberately made by someone with a knife or similar sharp instrument. There was nothing in the record to suggest the cut was possibly made by someone other than Goodrich. The plaintiff offered expert testimony that the tire was defective, and this was the type of cut customarily made by tire manufacturers on defective tires which were to be scrapped. Indeed, Goodrich initially conceded in interrogatories and pre-trial deposition that tires were scrapped by cutting the sidewall, although the cut would be approximately six inches in length rather than two and one-half inches.
Goodrich argues that this statement should only go to the credibility of the witness and cannot be used as substantive proof. We cannot agree. Answers to interrogatories are admissible as non-binding evidentiary admissions. See Taylor v. Fireman's Fund Ins. Co., 306 So.2d 638 (Miss. 1974); Maness v. Illinois Central R. Co., 271 So.2d 418 (Miss. 1972). When there is conflict between answers supplied in response to interrogatories and answers obtained through other questioning, either in deposition or trial, the finder of fact must weigh all the answers and resolve the conflict. See Freed v. Erie Lackawanna R. Co., 445 F.2d 619 (6th Cir.1971); Victory Carriers, Inc. v. Stockton Stevedoring Co., 388 F.2d 955 (9th Cir.1968); see also In re Dept. of Energy Stripper Well Exemption, 520 F. Supp. 1232 (D.Kan. 1981), rev'd on other grounds, 690 F.2d 1375 (1982).
The case closest to the present case from this Court is Falstaff Brewing Corp. v. Williams, supra, in which a bottle of beer exploded as the plaintiff was preparing to remove it from a storage cooler to another cooler in a restaurant. The shattered bottle was not examined. It was the contention of the brewer that any defective bottles would inevitably be broken and shattered in the rigor of the bottling process and loading and shifting long before it got to a retailer, and that expansion of the contents by freezing caused this particular bottle to shatter. The company vigorously contended that the bottle was not defective when they delivered it. Nevertheless, we held sufficient evidence was adduced for the chancellor to find, as he did, that the bottle broke from some cause other than freezing and the defect existed when it was delivered to the restaurant.
In Kappatos v. Gray Co., 124 Ill. App.2d 317, 260 N.E.2d 443 (1970), the Illinois court of appeals held the plaintiff offered sufficient evidence to make a jury issue that a small pinhole in a plastic spray painting *905 hose existed when it left the manufacturer, even though it may or may not have been used prior to its discovery, was over a year old, and the hose itself was disposed of and never examined by an expert. A few other illustrative close cases are: Lee v. Crookston Coca-Cola Bottling Co., 290 Minn. 321, 188 N.W.2d 426 (1971); Hawkeye-Security Insurance Co. v. Ford Motor Co., 174 N.W.2d 672 (Iowa 1970); Williams v. Ford Motor Co., 411 S.W.2d 443 (Mo. App. 1966).
Goodrich also contends the size of the verdict was so great as to evince bias, prejudice, etc. We cannot agree. In this Court's view, a 27-year-old married man with small children, who made his living with his hands, and who lost virtually the total use of his dominant right hand is not overly compensated in these times by a $250,000 verdict.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] There is a discrepancy between Thornton's and Taylor's testimony as to the date Thornton carried the tires to the filling station, as well as whether Taylor used new inner tubes or Thornton's old inner tubes in mounting the tires. Thornton testified he took the tires on January 9, whereas Taylor testified it was January 16, and Thornton said he took his used inner tubes and Taylor testified he used new inner tubes for the two tires. Thornton is obviously incorrect on the date because he returned for his wheels the same day he delivered them, and learned upon his return about the accident previously during that day.