# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00809-COA

| | |
|---|---|
| JENNIFER GREER AND CHRISTOPHER GREER | APPELLANTS |

v.

| | |
|---|---|
| VICKSBURG HEALTHCARE, LLC D/B/A MERIT HEALTH RIVER REGION | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/12/2023 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | AUBREY BRYAN SMITH III |
| | BOBBY L. DALLAS |
| | HEBER S. SIMMONS III |
| | JESSICA LEIGH DILMORE |
| ATTORNEYS FOR APPELLEE: | R. E. PARKER JR. |
| | CLIFFORD C. WHITNEY III |
| | PENNY B. LAWSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 06/16/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Around 8:30 a.m. on March 20, 2018, Jennifer Greer was admitted to Merit Health River Region Hospital in Vicksburg (River Region) with symptoms of dizziness, nausea, and headaches. Greer had a long history of migraine headaches, and her differential diagnosis upon admission was a suspected migraine headache. After she was admitted, emergency room physician Dr. Darius Fewlass and nurse Yi-Jie Pan, RN, treated Greer. While at River Region, Greer developed additional symptoms, including ataxia, nystagmus, increased

dizziness, and facial numbness and drooping on one side. Dr. Fewlass ordered a brain MRI, and the radiologist found no evidence of an intra-cranial abnormality or hemorrhage. Around 12:30 p.m., Greer asked to be transferred to another hospital, and around 2:30 p.m., she was transferred to Baptist Medical Center in Jackson (Baptist). At Baptist, Greer underwent another MRI and a CT. The radiologist who reviewed the MRI and CT, Dr. Korangy, misdiagnosed Greer with Miller-Fisher Syndrome, a variant of Guillain-Barré Syndrome, and Baptist treated Greer based on that misdiagnosis. It is undisputed that Dr. Korangy misread the images and failed to diagnose that Greer had experienced an arterial dissection in or near her brain. Twelve days later, while Greer was still a patient at Baptist, another physician re-reviewed the same images and realized that Greer had suffered an arterial dissection.

¶2. Greer later filed a medical malpractice complaint in the Hinds County Circuit Court against River Region, Dr. Fewlass, Dr. Korangy, and Baptist. Dr. Korangy settled with Greer prior to trial, and the case proceeded to trial against the remaining defendants. At trial, Greer put on no evidence against Baptist and did not oppose Baptist's motion for a directed verdict at the close of the evidence, which the trial court granted. Following jury instructions and closing statements, the jury returned a defense verdict in favor of River Region and Dr. Fewlass. Greer filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial, which was denied, and a notice of appeal.

¶3. On appeal, Greer has abandoned her claim against Dr. Fewlass and argues only that she is entitled to JNOV or a new trial on her claim against River Region. Specifically, Greer argues that River Region failed to rebut her evidence showing that nurse Pan breached the

nursing standard of care. However, for the reasons explained below, the jury's verdict is not against the overwhelming weight of the evidence. Therefore, we affirm the final judgment entered on the verdict.

## FACTS AND PROCEDURAL HISTORY

¶4. Greer has a documented history of migraine headaches since 2009. On March 20, 2018, Greer was a forty-year-old Advanced Practice Registered Nurse living in Vicksburg. On that date, Greer's mother, Florence Cooper, drove her to the emergency room at River Region because Greer was experiencing a severe headache, dizziness, nausea, and vomiting. At the time, Cooper was an operating room nurse with over forty years of experience. Greer was admitted to River Region at 8:33 a.m. Greer's vital signs were within normal limits. Greer testified that her headache started the morning of March 20. However, medical records from River Region and Baptist show that she began to experience what she perceived to be a typical migraine headache the previous day.

¶5. After her admission, Greer was assigned to nurse Pan and Dr. Fewlass for treatment. At 8:39 a.m., Dr. Fewlass assessed Greer and found her to be in obvious discomfort but alert with no acute distress. Dr. Fewlass ordered IV fluids and typical medications to treat Greer's suspected migraine headache, nausea, and vomiting.

¶6. Pan reassessed Greer at 9:30 a.m., noting that her vital signs remained normal, gait was steady, speech was clear, and extremity movements were normal. At 10:09 a.m., Pan took a blood sample, and no neurological deficits were noted. Pan assessed Greer again at 11:09 a.m., and all vitals were normal except for her systolic blood pressure, which was one

3

point above the reference range.

¶7.    Around 11:20 a.m., Pan documented the onset of additional symptoms, including numbness and drooping on the right side of Greer's face, and notified Dr. Fewlass. Dr. Fewlass made a bedside assessment, noted that Greer was exhibiting ataxia and nystagmus, and ordered an MRI to evaluate for a possible stroke. A radiologist reviewed the MRI and found no signs of acute intra-cranial abnormality or stroke. Around 12:30 p.m., Dr. Fewlass consulted with Greer and noted that although her headache and nausea had improved, her other symptoms persisted. Dr. Fewlass testified that he told Greer that he wanted to admit her to the hospital at River Region for a neurological consult because she was experiencing a neurologic issue that the MRI did not detect. However, Greer did not want to be admitted to River Region and requested a transfer to another hospital. At Greer's request, Dr. Fewlass facilitated her transfer to Baptist in Jackson for neurological evaluation. Greer was transferred to Baptist by ambulance at approximately 2:30 p.m. and admitted to Baptist at approximately 3:30 p.m.

¶8.    At Baptist, Greer reported that she had experienced "a headache described as typical for her migraine headaches since yesterday," i.e., March 19. Baptist ordered another MRI, as well as a CT scan. The reviewing radiologist, Dr. Korangy,[1] diagnosed Greer with Miller-Fisher Syndrome (MFS), a variant of Guillain-Barré Syndrome (GBS), a rare *autoimmune disorder*, and Baptist began treating Greer according to that diagnosis. However, it is undisputed that Dr. Korangy misread the images and that Greer did not have MFS/GBS.

---

[1] Dr. Korangy was based in Maryland and reviewed the images remotely.

4

Rather, Greer had experienced an arterial dissection in her brain that had caused occlusion in Greer's right vertebral artery—all of which Dr. Korangy failed to identify.

¶9. Due to Dr. Korangy's undisputed negligence, Greer was misdiagnosed and was not treated appropriately. *Twelve days later*, while Greer was still being treated as a patient at Baptist, Dr. Bridget Jones, a neurologist, re-reviewed Greer's initial images and for the first time identified the arterial dissection and blockage that Dr. Korangy had missed. Greer suffered significant permanent injuries as a result. Her vision has been drastically impaired, she requires the assistance of a cane to walk, and she has been unable to resume her career as a nurse.

¶10. Greer subsequently filed a medical malpractice complaint in the Hinds County Circuit Court against River Region, Dr. Fewlass, Dr. Korangy, and Baptist. Dr. Korangy settled with Greer and was dismissed from the case prior to trial, and the case proceeded to trial against the remaining defendants. Greer's claim against River Region was based on the alleged negligence of nurse Pan.

¶11. At trial, Greer acknowledged that she had a long history of migraine headaches, but she testified that the symptoms she was experiencing on March 20, 2018, were "much more intense." She testified that after Dr. Fewlass first assessed her at 8:39 a.m., he did not check on her again until around 11 a.m. She testified that she felt like Dr. Fewlass "brushed off" or "did not pay attention to [her] symptoms," and she believed that Dr. Fewlass should have given her a Tissue Plasminogen Activator (tPA), a potent blood-clot-busting drug used to treat a stroke and restore blood flow.

¶12. Irish Patrick-Williams testified for Greer as an expert in the field of nursing. Patrick-Williams testified that nurse Pan breached the nursing standard of care by failing to check on Greer with sufficient frequency (every 15 to 30 minutes) and by failing to report and document the deterioration in Greer's condition. Patrick-Williams testified that Pan should have reported Greer's new symptoms (nystagmus, ataxia, facial drooping, and numbness) to Dr. Fewlass immediately, and that if Dr. Fewlass failed to act, Pan should have notified her supervisor.

¶13. Dr. Haris Kamal, a neurologist, testified for Greer as an expert in the field of neurology. Dr. Kamal testified that Greer was already having a stroke prior to her arrival at River Region and should have been reevaluated every 15 to 30 minutes. Dr. Kamal testified that Pan should have "called a code stroke" when Greer's symptoms worsened, which would have resulted in a consultation with a radiologist. Dr. Kamal opined that if Pan had done so, Greer would have received a tPA and attained a better neurological outcome.

¶14. Dr. Michael Wilson testified for Greer as an expert in the field of emergency medicine. Dr. Wilson testified that Pan breached the standard of care by failing to recognize symptoms of a possible stroke and then failing to alert Dr. Fewlass to those symptoms.

¶15. Dr. Fewlass testified that although a severe headache is a possible symptom of a stroke, Greer was never a candidate for a tPA because she reported that her symptoms began the day before she arrived at River Region, putting her outside the window for the administration of tPA. Dr. Fewlass also testified that Greer was not having a stroke while she was under his care based on the results of her MRI at River Region.

6

¶16.    Dr. Alan Jones, an emergency room physician and the chair of the emergency department at the University of Mississippi Medical Center in Jackson, testified as an expert for Dr. Fewlass in the field of emergency medicine. Dr. Jones testified that all the care and treatment Greer received at River Region conformed to the standard of care. Dr. Jones testified that there are major risks associated with a tPA, including potentially devastating bleeding in the brain. Dr. Jones testified that Greer's initial presentation at River Region did not warrant administration of a tPA because Greer demonstrated no neurologic deficit at that time. Dr. Jones testified that even after Greer developed additional symptoms, Dr. Fewlass did not breach the standard of care by not giving a tPA because Greer was possibly outside the "window" of time in which a tPA would have been effective; because her symptoms indicated, at most, a "mild stroke"; and because the risks of giving her a tPA would have outweighed any possible benefits. Dr. Jones also testified that Dr. Fewlass appropriately relied on Greer's MRI, the "gold standard test" for a stroke, which showed no stroke or other adverse neurological findings. Finally, Dr. Jones testified that Greer was ultimately diagnosed (at Baptist) with an arterial dissection and occlusion, not a true stroke. Dr. Jones stated that a tPA would not be the appropriate course of treatment for a dissection.

¶17.    Dr. William Evans testified for Dr. Fewlass as an expert in the fields of neurology and neurology consultations in an emergency room setting. Dr. Evans testified that Dr. Fewlass made the correct decision not to administer a tPA to Greer because the risks of doing so in her case outweighed the benefits. Dr. Evans testified that administering a tPA to a patient such as Greer, who had experienced an arterial dissection in her brain, "would not have

helped and it may have very well harmed" her. Dr. Evans also testified that the "window" during which a tPA might be beneficial had likely closed before Greer developed additional symptoms at River Region. He testified that Dr. Fewlass "was well within the standard of care" not to administer a tPA to Greer. Dr. Evans testified that Dr. Fewlass provided appropriate care and that if Dr. Korangy had read Greer's subsequent MRI correctly, there still would have been an "opportunity for all the typical stroke medicines to be given."

¶18. Dr. Steven Stogner, a board-certified "intensivist," or critical care doctor, testified for River Region as an expert in the fields of critical care/intensive care, internal medicine, and pulmonary medicine. Dr. Stogner testified that based on Greer's history of migraines and symptoms, Dr. Fewlass "absolutely complied" with the standard of care by initially diagnosing a migraine headache and later ordering an MRI. Dr. Stogner further testified that Dr. Fewlass complied with the standard of care by not ordering a tPA. He testified that the risks of administering such a drug would have outweighed any potential benefit under the circumstances and that a tPA was not an appropriate treatment for an arterial dissection of the type that was finally diagnosed twelve days later at Baptist. Dr. Stogner also testified that Dr. Fewlass was warranted in assuming that Greer had not experienced a stroke once the radiologist reviewed her MRI and found that it was normal.

¶19. At the close of evidence, Baptist moved for a directed verdict. Greer conceded that she had put on no evidence against Baptist and therefore did not oppose Baptist's motion, which the trial court granted. Greer and the remaining defendants also moved for directed verdicts, which the trial court denied.

¶20. Following jury instructions and closing statements, the jury returned a verdict in favor of Dr. Fewlass and River Region. Greer filed a motion for JNOV or a new trial, which the trial court denied, and a notice of appeal.

¶21. On appeal, Greer has abandoned her claim against Dr. Fewlass. However, Greer argues that she is entitled to JNOV or a new trial on her claim against River Region because, according to Greer, unrebutted evidence established that Pan breached the standard of care.

## ANALYSIS

¶22. "Motions for directed verdict and [JNOV] challenge the legal sufficiency of the evidence. We review such motions de novo, and if a verdict for the nonmoving party can possibly be supported by the evidence—when viewed in the light most favorable to that party—then neither a directed verdict nor a JNOV is appropriate." *Loyacono v. Travelers Ins. Co.*, 163 So. 3d 932, 935 (¶9) (Miss. 2014) (quotation marks and footnote omitted).

¶23. A trial judge may order a new trial if "the verdict is against the overwhelming weight of the evidence." *Bobby Kitchens Inc. v. Miss. Ins. Guar. Ass'n*, 560 So. 2d 129, 132 (Miss. 1989). A motion for a new trial is addressed to the discretion of the trial judge. *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942, 947 (¶18) (Miss. 2000). But the trial judge's discretion "should be exercised with caution" and "invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* (quoting *United States v. Sinclair*, 438 F.2d 50, 51 n.1 (5th Cir. 1971)).

¶24. When we review the denial of a motion for a new trial, "[t]wo high standards of deference apply." *Weber v. Est. of Hill*, 335 So. 3d 1030, 1038 (¶35) (Miss. 2021). "First,

this Court affords the trial court substantial deference to its determination on the weight of the evidence issue and whether to grant a new trial." *Id.* "This Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a[n] abuse of that judge's discretion." *Bobby Kitchens Inc.*, 560 So. 2d at 132. "A court abuses its discretion by relying on an erroneous or improper statement of the law or by applying improper or erroneous facts." *Weber*, 335 So. 3d at 1038 (¶35) (quoting *Redmond v. State*, 288 So. 3d 314, 316 (¶7) (Miss. 2020)). Our standard of review is highly deferential because we recognize that the trial judge is in a "superior position . . . to decide such matters." *Amiker*, 796 So. 2d at 948 (¶21). "It has long been recognized that the trial judge is in the best position to view the trial." *Id.* at 947 (¶16). Unlike an appellate court, which must rely on a "cold, printed record," the trial judge hears and observes the witnesses firsthand and "smells the smoke of the battle." *Id.*

¶25. "Second, this Court gives great deference to the jury verdict itself." *Weber*, 335 So. 3d at 1038 (¶36) (quotation marks omitted). We "must resolve all conflicts in the evidence and every permissible inference from the evidence in the appellee's favor." *Id.* (quotation marks omitted). In a case tried before a jury, "[t]he weight and credibility of the witnesses . . . was for the jury, who were free to accept or reject whatever part of their testimony they chose." *Fleming v. Floyd*, 969 So. 2d 868, 878 (¶25) (Miss. 2007) (quoting *BF Goodrich Inc. v. Taylor*, 509 So. 2d 895, 903 (Miss. 1987)). Put simply, "[t]his Court . . . is not the jury," *id.*, and we are "required to defer to the jury" when it comes to the weight of the evidence and the credibility of the witnesses. *Weber*, 335 So. 3d at 1038 (¶36).

¶26. On appeal, Greer contends that River Region failed to produce any evidence to rebut Patrick-Williams's testimony that nurse Pan breached the nursing standard of care. For that reason, Greer argues that the trial judge should have granted her motion for JNOV or a new trial. We disagree. For the reasons explained below, the trial judge did not err by denying Greer's motion for JNOV, nor did the trial judge abuse his discretion by denying a new trial.

¶27. "Mississippi law requires a plaintiff in a medical malpractice action to produce sworn expert testimony supporting his or her claim in order to establish a prima facie case of malpractice." *Scales v. Lackey Mem'l Hosp.*, 988 So. 2d 426, 433 (¶17) (Miss. Ct. App. 2008). As the Mississippi Supreme Court has stated, the "plaintiff has the burden of proof, and must offer evidence that persuades the jury. The jury is not required to believe or trust the evidence submitted by the plaintiff, and is free to accept all, part, or none of the plaintiff's evidence. *A defendant is not required to prove or rebut anything.*" *Thompson v. Dung Thi Hoang Nguyen*, 86 So. 3d 232, 236-37 (¶13) (Miss. 2012) (emphasis added).

¶28. Contrary to Greer's argument, the burden does not shift to a medical malpractice defendant just because a plaintiff offers sufficient evidence to establish a prima facie case. As the Supreme Court has held, "[t]here is no such case requiring that the defendant offer expert testimony or risk a directed verdict." *McCaffrey v. Puckett*, 784 So. 2d 197, 206 (¶33) (Miss. 2001). River Region's decision not to present an expert regarding the nursing standard of care did not entitle Greer to a directed verdict, JNOV, or a new trial.

¶29. In addition, Greer alleged and Patrick-Williams testified that Pan breached the standard of care by failing to check on Greer with sufficient frequency (every 15 to 30

minutes) and failed to alert Dr. Fewlass to changes in Greer's condition. However, Dr. Fewlass testified that the emergency room at River Region was "small" and that he could see every patient from his desk in the middle of the emergency room. Dr. Fewlass explained that he would frequently "walk[] by and see[] the patient" and check her vital signs, condition, and treatment without formally documenting it in her medical records. Dr. Fewlass stated, "[T]hat happens all the time." Dr. Fewlass testified that he also frequently interacted with the emergency room nurses at River Region. Thus, the jury reasonably could have inferred that Pan and Dr. Fewlass monitored Greer more frequently than the instances documented every 30 to 60 minutes in Greer's records.

¶30. Moreover, the gravamen of Greer's complaint against River Region is that Pan's alleged failures contributed to the failure to diagnose her with a stroke and the failure to give her a tPA. However, the attending physician, Dr. Fewlass, testified that he was aware of Greer's symptoms and that Greer did not have a stroke while she was at River Region. Multiple defense experts testified that Dr. Fewlass's diagnosis and treatment were reasonable and conformed to the standard of care. Dr. Jones testified that all the care and treatment Greer received at River Region conformed to the standard of care. Furthermore, Dr. Fewlass testified that administration of a tPA would *not* have been an appropriate treatment while Greer was at River Region. Indeed, as described above, Dr. Fewlass, Dr. Jones, Dr. Evans, and Dr. Stogner all testified that the risks of a tPA would have outweighed its benefits and that a tPA would not be an appropriate treatment for the arterial dissection ultimately diagnosed twelve days later at Baptist. Of course, Greer's experts disagreed. But given the

12

testimony of Dr. Fewlass and three different defense experts, a rational jury certainly could have found that any alleged negligence by Pan was not a proximate cause of Greer's injuries.

¶31.   We further note that the overwhelming weight of the evidence showed that Dr. Korangy's negligence proximately caused Greer's injuries.  There is no dispute that Dr. Korangy caused Greer to be treated for the wrong condition—an autoimmune disorder—for twelve days before another physician recognized Dr. Korangy's mistake.  All parties agreed that Dr. Korangy was negligent, and Dr. Korangy settled with Greer prior to trial.  A rational jury could have determined that Dr. Korangy was the sole proximate cause of Greer's injuries.  In addition, although Greer faulted Pan and River Region for not recognizing that she had (allegedly) experienced a stroke, Greer was in Baptist's care for *another twelve days* before anyone at Baptist diagnosed her arterial dissection.

¶32.   In sum, the jury in this case heard conflicting fact and expert testimony regarding fault and causation.  The weight of the evidence and credibility of the witnesses were matters for the jury to determine.  *Fleming*, 969 So. 2d at 878 (¶25).  As the Supreme Court stated in *Fleming*,

> the jury may consider the expert testimony for what they feel that it is worth, and may discard it entirely . . . . *This Court, of course, is not the jury*. The weight and credibility of the witnesses, primarily experts, was for the jury, who were free to accept or reject whatever part of their testimony they chose.

*Id.* (emphasis added) (brackets, quotation marks, and citations omitted).  Again, the Supreme Court has held that "[t]he jury is not required to believe or trust the evidence submitted by the plaintiff, and is free to accept all, part, or none of the plaintiff's evidence.  *A defendant is not required to prove or rebut anything*." *Thompson*, 86 So. 3d at 236-37 (¶13) (emphasis

13

added).

## CONCLUSION

¶33.    Given the conflicting evidence presented at trial, the trial judge did not err by denying

Greer's motions for a directed verdict and JNOV, nor did he abuse his discretion by denying

Greer's motion for a new trial.

¶34.    Therefore, the judgment of the circuit court is **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.  McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**