# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00722-COA

**BEVERLY KNIGHT AND KEITH KNIGHT**                                    **APPELLANTS**

**v.**

**W. CRAIG CLARK M.D.**                                                          **APPELLEE**

DATE OF JUDGMENT:                      03/23/2017
TRIAL JUDGE:                                   HON. JAMES MCCLURE III
COURT FROM WHICH APPEALED:    DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:         LINDSEY C. MEADOR
                                                        GARY K. SMITH
                                                        C. PHILIP M. CAMPBELL
ATTORNEY FOR APPELLEE:               SHELBY KIRK MILAM
NATURE OF THE CASE:                      CIVIL - MEDICAL MALPRACTICE
DISPOSITION:                                   AFFIRMED - 04/02/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

  **EN BANC.**

  **J. WILSON, P.J., FOR THE COURT:**

¶1.     This appeal follows a defense verdict in a medical malpractice case.  The jury found

that Dr. Craig Clark did not breach the standard of care in his treatment of Beverly Knight.

On appeal, Knight argues that there is insufficient evidence to support the verdict, that the

verdict is against the overwhelming weight of the evidence, that the trial judge abused his

discretion by limiting the testimony of one of her expert witnesses, and that the defense

expert improperly offered new and previously undisclosed opinions at trial.  For the reasons

discussed below, we hold that there is sufficient evidence to support the verdict, that the

verdict is not against the weight of the evidence, and that no reversible error occurred during

trial.  Therefore, we affirm the judgment entered on the verdict.

## FACTS AND PROCEDURAL HISTORY

¶2.     In 2006, Knight began experiencing problems with pain in her lower back and right leg.[1]  She was referred to Dr. Craig Clark, a neurosurgeon then practicing in DeSoto County. Dr. Clark recommended a transforaminal lumbar interbody fusion (TLIF).

¶3.     A TLIF is a surgical procedure that attempts to fuse vertebrae in order to stabilize the patient's spine.  A rod is used to hold the vertebra together to allow fusion to occur.  The rod is held in place by "pedicle screws," which the surgeon must insert into the pedicles.  The pedicles are bony projections that extend from the back of the vertebra on either side.  The pedicles help to protect the spinal canal and the spinal nerves.  Dr. Clark performed a TLIF on Knight in February 2007 and inserted four pedicle screws into Knight's pedicles at the L5-S1 region of the spine.

¶4.     Dr. Clark, a board certified neurosurgeon, testified that he had performed this procedure approximately 350 to 400 times.  Dr. Clark and his expert witness, Dr. Walter Eckman, testified that the pedicle screws must be inserted into the pedicle at an angle because of the length of the screws and because "the goal is to get as much bony purchase as you can without traversing the area where the nerves are."  The screws should enter the vertebral body through the pedicle and should not "breach" the wall of the pedicle and enter the spinal canal.  The spinal nerves are located inside the spinal canal, so a screw that breaches the spinal canal has the potential to impinge on the spinal nerves and cause pain.

---

[1] Knight underwent lower back surgery (a laminectomy) in 1999, but she testified that she had fully recovered prior to 2006.

¶5. After her surgery, Knight had approximately five follow-up visits with Dr. Clark between February and August 2007. Knight reported continuing pain, and Dr. Clark prescribed pain medication. He also prescribed physical therapy. In May 2007, Knight was released to work half days at her job at a bank, and by August 2007 she had returned to work full-time. She continued to report pain through her last visit with Dr. Clark in August 2007. Knight testified that she told Dr. Clark that, in particular, she was continuing to experience pain in her left leg. However, she also told Dr. Clark that she was "80 to 85 percent better" in her back and right leg.

¶6. Dr. Clark advised Knight that it would take up to two years for her to fully recover from the surgery. Dr. Clark last saw Knight in August 2007. He testified that at that point he considered her recovery from the surgery to be within the normal range of what could be expected. He told her that as long as she was able to tolerate eight-hour days at work, she should continue to give her recovery "some time." He also advised her to return to see him "as needed."

¶7. Although Dr. Clark did not see Knight after August 2007, Knight continued to call Dr. Clark's office for normal prescription refills until January 2009. Dr. Clark testified that Knight was taking only a non-addictive pain medication, which he considered a "comfort issue" and not an indication of any underlying problem.

¶8. In October 2008, Knight moved to Tennessee and began seeing new doctors. She continued to experience pain, primarily in her left leg. In December 2009, she underwent an MRI, which showed that one of the pedicle screws was angled into or near the spinal canal,

3

although the written MRI report specifically noted that there was no apparent nerve root impingement at the L5-S1 level.

¶9.     Knight subsequently was referred to Dr. Craig Humphreys, an orthopedic surgeon in Chattanooga.  In July 2010, Dr. Humphreys ordered a CT myelogram and, after reviewing the images, concluded that one of the pedicle screws inserted during Knight's TLIF had breached her spinal canal and was touching spinal nerves.  Dr. Humphreys recommended surgery to remove the pedicle screws and other hardware from Knight's lower back.  Dr. Humphreys performed that surgery in August 2010.  Dr. Humphreys concluded that there was adequate fusion from the TLIF and that Knight's spine and lower back were stable.

¶10.    In August 2011, Knight filed a medical malpractice lawsuit against Dr. Clark in DeSoto County Circuit Court.  The case eventually proceeded to trial in March 2017.  In his testimony at trial, Dr. Clark denied that he misplaced the pedicle screw and denied that any breach of the spinal canal occurred during Knight's surgery.  Dr. Clark also denied that he breached the standard of care, and he denied that Knight's pain was caused by the pedicle screw.

¶11.    Dr. Clark testified that after he inserts pedicle screws, he uses a "ball probe" to check their placement.  The ball probe is inserted into the spinal canal during the surgery, and the surgeon is able to use it to "feel" for any breach of the spinal canal.  Dr. Clark testified that the probe gives the surgeon "tactile feedback" so that "if the screw actually has penetrated into the canal or an open space," the surgeon "can feel that" and can correct the placement of the screw.  Use of a ball probe is a common and accepted surgical technique.  Dr. Clark

4

testified that he used the ball probe in this case to confirm that no screw had breached the spinal canal.

¶12. Dr. Clark, his expert witness (Dr. Eckman), and one of Knight's expert witnesses (Dr. Martin Cooper), all agreed that an initial misplacement of a pedicle screw is not a breach of the standard of care. In fact, it is common for the surgeon to misplace a screw during the surgery, at least initially. The standard of care requires the surgeon to attempt to detect and correct any misplaced screws by using tools such as a fluoroscopy, which shows a continuous x-ray image during the procedure, and a ball probe. Dr. Clark utilized both of those tools during Knight's procedure.

¶13. Dr. Clark testified that during Knight's surgery he used the ball probe to check for any breach of the spinal canal, and he testified that there was no breach of the spinal canal during the procedure. He testified, "I did not place that screw in the spinal canal or I would have felt a breach with the probe." Dr. Clark was consistent and adamant that he did not breach the spinal canal. He testified that the screw at issue in this lawsuit must have "moved" or "migrated" after Knight left his care.

¶14. On this specific issue, Dr. Clark's testimony diverged from the opinion of his own expert, Dr. Eckman, who is also a board certified neurosurgeon. Dr. Eckman opined that the screw *was* misplaced during the surgery and that there was a breach of the spinal canal during the surgery. Dr. Eckman did not believe that the screw had moved or migrated post-surgery. Dr. Eckman did *not* say that "migration" of a screw "could never happen." Dr. Eckman did not "think" that migration "happened in this case." However, he testified that

5

migration possibly could occur "if you had terribly soft bone."

¶15.    Dr. Eckman also testified that, despite misplacing a screw, Dr. Clark met the standard of care both during and after Knight's surgery.  Dr. Eckman explained his opinion on this issue as follows:

Q.    . . . [D]o you have an opinion of whether or not in this procedure Dr. Clark met the standard of care in performing this procedure?

A.    Yes.

Q.    Okay.  What is that opinion?

A.    Okay. The first issue, placement of the screw. There is no standard for that. What's important to know with the placement of these screws, I would be shocked if you could find a surgeon who has put in any number of these pedicle screws that has not misplaced one.  My error rate is extremely small. Even the robots have a certain error rate. They're using robots to put these in some now.  So it can be improved with some technology and some different techniques, but it is something every surgeon has experienced.  So it is not -- misplacement of a pedicle screw is simply not any kind of negligent action.  It is not beyond any standard.  As I said, there is no standard because nobody can do it without errors.  Okay.

The rest of it is, what is he doing to try to protect his patient during the procedure? Well, he made an effort to feel that pedicle to try to see if the pedicle screw was misplaced, and unfortunately, the anatomy of the structure is such a way that he couldn't feel it or see it or find it because it was hidden from him by the position of the screw being so far medial.  Okay.  But he made the effort, which is what you have to ask of your doctor.  Do the best you can.

So he has a standard technique.  He uses the little ball probe that he puts down in the drill hole to try to feel it.  He tried to make it safer by using that.  Obviously, it's not always a perfect technique I would say. He used the fluoroscopy trying to help guide also very much trying to help the patient.

So all of these are efforts to do a good procedure.  The fact that part of

6

> the procedure didn't work out perfectly is something that happens. It will happen to all of us as surgeons who do these kind of operations.
>
> Q.   Did that meet the standard of care?
>
> A.   The standard is doing an appropriate procedure and doing it within -- as I said, his operation is the more common in this country than mine.
>
> . . . .
>
> A.   So he meets that standard of care better than I do.
>
> Q.   Okay. All right. Now, . . . let's change our focus . . . to after the surgery. Did Dr. Clark's treatment of Ms. Knight after the surgery meet the standard of care?
>
> A.   Yes.
>
> Q.   Okay. Tell us why.
>
> A.   . . . What we want of our doctors that operate on us is to have some method of postoperative followup . . . .

Dr. Eckman went on to explain that, in his opinion, Dr. Clark provided appropriate monitoring and care after the surgery. According to Dr. Eckman, Knight's post-operative recovery was within the normal range, and nothing that Knight reported to Dr. Clark should have caused him to order an MRI or any other diagnostic procedure.

¶16.   Finally, Dr. Eckman testified that the pedicle screw that had breached the spinal canal was not the cause of Knight's continuing pain. Dr. Eckman concluded that Knight's continuing pain was a result of a "nonunion" or a failure to achieve a solid fusion of the vertebrae. Dr. Eckman explained that the nonunion did not indicate any breach of the standard of care and was not caused by anything that Dr. Clark did or did not do during or after the surgery.

7

¶17.    Knight called two experts to testify in support of her claim.  Dr. Martin Cooper, a board certified neurosurgeon, testified by deposition.  Dr. Cooper testified that an initial misplacement of a pedicle screw is not malpractice.  He agreed that "a certain percentage of screws . . . are misplaced" even with surgeons who meet the standard of care.  However, Dr. Cooper testified that it is a breach of the standard of care to fail to recognize and correct the error during the surgery by removing and repositioning the screw.  Dr. Cooper testified that the intraoperative fluoroscopy images clearly showed that one of the four pedicle screws was misplaced and had breached the spinal canal.[2]  Dr. Cooper opined that Dr. Clark should have recognized the misplacement and corrected it during the surgery.  Dr. Cooper also testified that Knight's post-surgery complaints of pain to her left side should have alerted Dr. Clark to a possible problem and caused him to order an MRI or other diagnostic test.  According to Dr. Cooper, this also would have led Dr. Clark to discover the misplacement.  Dr. Cooper testified that Dr. Clark's failure to order such tests was also negligence.

¶18.    Dr. Dennis Whaley, a radiologist and neuroradiologist, similarly testified that the fluoroscopy images clearly showed that a pedicle screw was misplaced.  Dr. Whaley also opined that the images showed that the screw had breached the spinal canal and had impacted the nerve root in the spinal column.  As discussed below, the trial judge ruled that Dr. Whaley would not be allowed to testify as to the standard of care for a neurosurgeon.

---

[2] In contrast, both Dr. Clark and Dr. Eckman testified that the images did *not* establish that the screw was misplaced.  Indeed, Dr. Eckman testified that the fluoroscopy images were "useless" for purposes of making that determination.  Dr. Eckman further testified that the fact that one of the screws was at a different angle than the other three did not indicate that the screw was misplaced.  He testified that the insertion of screws at different angles was common and appropriate.

¶19.  After the close of all the evidence, and after deliberating for approximately eight hours, the jury returned a verdict in favor of Dr. Clark.  The verdict form required the jury to answer special interrogatories.  In its verdict, the jury first rejected Dr. Clark's statute of limitations defense.  However, the jury then answered "No" to a special interrogatory that asked whether Dr. Clark was "negligent by deviating from the standard of care."  Because the jury answered that question in the negative, the jury did not proceed to special interrogatories on the issues of causation and damages.

¶20.  On appeal, Knight argues that she is entitled to judgment notwithstanding the verdict (JNOV) on the issue of negligence because there was insufficient evidence to support the jury's verdict.[3]  In the alternative, Knight argues that the trial judge abused his discretion by denying her motion for a new trial based on the weight of the evidence.  Finally, Knight argues that the trial judge abused his discretion by limiting Dr. Whaley's testimony and that Dr. Eckman improperly offered new and previously undisclosed opinions during trial.  We address these issues in turn below.  We conclude that there is sufficient evidence to support the verdict, that the verdict is not against the weight of the evidence, and that no reversible error occurred during trial.  Therefore, we affirm the judgment entered on the jury's verdict.

**ANALYSIS**

I.   **The trial judge did not err by denying Knight's motion for JNOV or abuse his discretion by denying her motion for a new trial.**

¶21.  "When reviewing the denial of a motion for JNOV, we consider the evidence in the

_____

[3] Knight implicitly recognizes that Dr. Eckman's testimony created a jury question on the issue of causation, as she requests that we render a judgment in her favor on the issue of negligence only and remand for a new trial on the issues of causation and damages.

light most favorable to the non-moving party, and give that party the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Natchez Elec. & Supply Co. v. Johnson*, 968 So. 2d 358, 361 (¶12) (Miss. 2007). "If the facts, considered in that light, point so overwhelmingly in favor of the party requesting the JNOV that reasonable persons could not have arrived at a contrary verdict, we will reverse and render." *Id.* at 361-62 (¶12). "If there is substantial evidence in support of the verdict we will affirm the denial of the JNOV." *Id.* at 362 (¶12). "'Substantial evidence' is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions." *Id.*[4]

¶22. If the moving party is not entitled to JNOV, the trial judge may grant a new trial if "the verdict is against the overwhelming weight of the evidence." *Bobby Kitchens Inc. v. Mississippi Ins. Guar. Ass'n*, 560 So. 2d 129, 132 (Miss. 1989).[5] A motion for a new trial is addressed to the discretion of the trial judge. *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942, 947 (¶18) (Miss. 2000). However, that discretion "should be exercised with great caution" and "should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* (quoting *United States v. Sinclair*, 438 F.2d

---

[4] *See also McGovern v. Scarborough*, 566 So. 2d 1225, 1228 (Miss. 1990) ("A case should never be taken from the jury if, from the facts favorable to the party adversely affected together with all reasonable inferences therefrom, it can be said that a rational jury could find in his favor. This Court is never unmindful of this rule." (citations omitted)).

[5] The Supreme Court has explained that a somewhat "greater quantum of evidence [supportive of the verdict] is necessary . . . to withstand a motion for a new trial as distinguished from a motion for [JNOV]." *Adams v. Green*, 474 So. 2d 577, 582 (Miss. 1985) (quoting *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 714 (Miss. 1984)).

50, 51 n.1 (5th Cir. 1971)).

¶23.   When we review the denial of a motion for a new trial, we must also keep in mind that "[t]his Court . . . is not the jury." *Fleming v. Floyd*, 969 So. 2d 868, 878 (¶25) (Miss. 2007) (quoting *BFGoodrich Inc. v. Taylor*, 509 So. 2d 895, 903 (Miss. 1987)).  In a case such as this one, "[t]he weight and credibility of the witnesses, primarily experts, was for the jury, who were free to accept or reject whatever part of their testimony they chose." *Id.* "[J]udging the expert's testimony and weight to be accorded thereto is the province of the jury." *Id.* (quoting *Daniels v. GNB Inc.*, 629 So. 2d 595, 603 (Miss. 1993)).  "The jury may consider the expert testimony for what they feel that it is worth, and may discard it entirely." *Id.* (quoting *Chisolm v. Eakes*, 573 So. 2d 764, 767 (Miss. 1990)).

¶24.   In contrast, as an appellate court,

> [w]e do not reweigh evidence.  We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence.  Those decisions belong solely to the jury.  Our role as appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

*Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017).

¶25.   Moreover, our role as an appellate court is even more limited than that of the trial judge.  "This Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a abuse of that judge's discretion." *Bobby Kitchens*, 560 So. 2d at 132.  The trial judge is accorded discretion, and our review is deferential, because the trial judge is in a "superior position . . . to decide such matters." *Amiker*, 796 So. 2d at 948 (¶21). "It has long been recognized that the trial judge is in the best position to view the trial." *Id.*

11

at 947 (¶16). Unlike an appellate court, which must rely on a "cold, printed record," the trial judge hears and observes the witnesses firsthand and "smells the smoke of the battle." *Id.* Therefore, "the *trial* court—and the trial court alone"—acts, in a very limited sense, as a "thirteenth juror" when ruling on a motion for a new trial. *Little*, 233 So. 3d at 292 (¶19). Our role is only to review the trial judge's decision for an abuse of discretion. *Id.* at 292 (¶21); *Adams*, 474 So. 2d at 582.

¶26.    In this case, these well-settled principles require us to affirm the judgment entered on the jury's verdict and the trial judge's denial of a new trial. A rational jury could have found Dr. Clark's testimony credible. The jury could have believed Dr. Clark that he used the ball probe to check carefully for any breach of the spinal canal. The jury could have concluded that Dr. Clark would have detected a breach of the spinal canal if one had occurred. And the jury could have concluded that Dr. Clark did not find a breach because there was none. Thus, the jury could have found that Dr. Clark did not misplace the screw, that he met the standard of care, and that the screw moved or migrated after Knight left his care.

¶27.    There was additional evidence to support Dr. Clark's testimony in the form of two radiology reports. The radiologist who reviewed the fluoroscopy post-surgery reported that the images showed "screws extending through the L5 and S1 levels into the vertebral bodies" and that "[a]lignment [was] maintained." The radiologist also concluded that the "pedicle screws appear[ed] to be in place within the L5-S1." In addition, Knight underwent another MRI more than two years after her surgery (on December 8, 2009), and the reviewing radiologist reported that he could identify "[n]o apparent nerve root compression" at the L5-

12

S1 level—i.e., no evidence that a screw was then impinging on a spinal nerve. Both radiologists noted difficulties in visualizing the screws on the images of Clark's spine. Nonetheless, the jury could have found that these radiology reports tended to support Dr. Clark's testimony that he did not breach the spinal canal during the surgery.[6]

¶28.    To be sure, Knight offered evidence to support her claim that Dr. Clark misplaced the pedicle screw during her operation—including even the opinion of Dr. Clark's own expert, Dr. Eckman. However, the jury was free to reject that evidence "entirely" and give greater weight to the testimony of Dr. Clark, who consistently maintained that he did not misplace the screw during the surgery. *Fleming*, 969 So. 2d at 878 (¶25). "The jury may give whatever weight it chooses to a witness'[s] testimony or other evidence." *Wilmoth v. Peaster Tractor Co. of Lexington*, 544 So. 2d 1384, 1386 (Miss. 1989). "Once again, the jury is the sole judge of the credibility of witnesses and the weight of the evidence." *Solanki v. Ervin*, 21 So. 3d 552, 570 (¶49) (Miss. 2009); *accord, e.g.*, *Dorrough v. Wilkes*, 817 So. 2d 567, 574 (¶¶22, 25) (Miss. 2002). And it is the "province of the jury" to resolve any conflicts in the

---

[6] The dissent likens this case to *Samuels v. Mladineo*, 608 So. 2d 1170 (Miss. 1992), where the Supreme Court stated that "[a] surgeon's memory, his recollection, that he performed every step of some particular surgery properly cannot withstand physical evidence to the contrary." *Id.* at 1182. However, *Samuels*'s holding does not fit the evidence presented at trial in this case. As noted above, the "physical evidence" in this case was *not* undisputed. *See supra* note 2. Both Dr. Clark and Dr. Eckman testified that the fluroscopy images did not establish that the screw breached the spinal canal. Indeed, although Knight's experts relied heavily on them, Dr. Eckman testified that the images were essentially "useless" for purposes of determining whether a screw had breached the spinal canal. Dr. Eckman also testified that the different angles of the screws, as shown in the images, were appropriate and not a cause for concern. Finally, as discussed above, the jury was presented with radiology reports from 2007 and 2009 that did not identify any misplacement of a screw.

13

evidence. *Adams*, 474 So. 2d at 581. In this case, the conflicts in the evidence on the issue of negligence created an issue for the jury to decide. Therefore, we also cannot say that the trial judge, who listened to and observed these witnesses firsthand, abused his discretion by denying Knight's motion for a new trial.

¶29. Moreover, even if the jurors did believe that Dr. Clark misplaced the screw, there was still additional evidence to support a finding and verdict in favor of Dr. Clark on the issue of negligence. As quoted above, *see supra* ¶15, Dr. Eckman opined that the standard of care requires a neurosurgeon to use appropriate surgical techniques, to take precautions to try to detect and prevent any breach of the spinal canal, and to provide appropriate postoperative followup. Dr. Eckman testified that Dr. Clark met all those criteria: Dr. Clark's surgical procedure was "common" and "appropriate," he used a ball probe and fluoroscopy to try to prevent and detect any breach of the spinal canal, and he appropriately monitored Knight's recovery after the operation. Dr. Eckman testified that no surgeon can be "perfect" and that a surgeon can only take precautions to try to "protect his patient during the procedure." According to Dr. Eckman, Dr. Clark met that standard of care.

¶30. Again, it is true that Knight presented contrary expert opinions. But the jury was free to reject those opinions and credit the testimony of Dr. Eckman instead. Our Supreme Court "has held that the winner in a battle of the experts is to be decided by a jury." *Hill v. Mills*, 26 So. 3d 322, 330 (¶28) (Miss. 2013). Because the conflict in the expert testimony was an issue for the jury to decide, the trial judge did not abuse his discretion by denying Knight's motion for a new trial. And because there was legally sufficient evidence to support the

jury's verdict, the trial judge did not err by denying Knight's motion for JNOV.

## II. The trial judge did not abuse his discretion by limiting one of Knight's expert witnesses to his field of expertise.

¶31. Knight also argues that the trial judge abused his discretion by ruling that Dr. Whaley, a radiologist and neuroradiologist, could not testify as to the standard of care for a neurosurgeon and could not testify that Dr. Clark had breached the standard of care. Dr. Whaley was allowed to testify as an expert in the field of neuroradiology and offer opinions regarding Knight's fluoroscopy images and subsequent x-rays.

¶32. "Absent an abuse of discretion, a judge's determination as to the qualifications of an expert witness will remain undisturbed on appeal." *Hubbard v. Wansley*, 954 So. 2d 951, 956 (¶11) (Miss. 2007). "It is generally not required that an expert testifying in a medical malpractice case be of the same specialty as the doctor about whom the expert is testifying." *Id.* at 957 (¶13). However, the witness must demonstrate "[s]atisfactory familiarity with the specialty of the defendant doctor" before the witness will be permitted to testify and offer opinions "as to the standard of care owed to the plaintiff patient." *Id.* In *Hubbard*, the Supreme Court held that the trial court did not abuse its discretion by ruling that a neurosurgeon was not qualified to testify as to the standard of care applicable to a doctor practicing internal medicine. *See id.* at 956-58 (¶¶10-19). This was true even though the neurosurgeon had firsthand experience treating patients diagnosed with the same injury. *See id.* at 958 (¶18). Similarly, this Court has held that a thoracic and cardiovascular surgeon was not qualified to testify regarding the standard of care for a gastroenterologist. *Cleveland v. Hamil*, 155 So. 3d 829, 833-35 (¶¶19-27) (Miss. Ct. App. 2013), *aff'd in relevant part and*

15

*rev'd in part on other grounds*, 119 So. 3d 1020 (Miss. 2013). We so held even though the witness testified that the work of a gastroenterologist "would cross [his] work as a surgeon." *Id.* at 935 (¶26). We held that was insufficient to establish that the witness was "familiar[] with the specialty of gastroenterology and the standard of care required of a gastroenterologist." *Id.*; *accord, e.g.*, *Troupe v. McAuley*, 955 So. 2d 848, 857-58 (¶¶23-29) (Miss. Ct. App. 2007) (holding that trial court did not abuse its discretion by ruling that neurosurgeon was not qualified to testify as to the standard of care for a neuro-otolaryngologist).

¶33. In this case, Dr. Whaley admitted that he had no experience in neurosurgery or even general surgery. He had never performed a TLIF or any other procedure involving pedicle screws. Since 2008, he has practiced "general outpatient diagnostic radiology," reviewing all manner of x-rays "from head to toe." Dr. Whaley acknowledged that he "certainly wouldn't . . . attempt to give a standard-of-care opinion of the overall breadth of what a neurosurgeon does." Yet, he believed that he "would know" and "could say" that some "things . . . violate[] the standard of care." Dr. Whaley thought that he was qualified to give such testimony because "there are things that [radiologists] work closely [with neurosurgeons] in."

¶34. We hold that the trial judge did not abuse his discretion by limiting Dr. Whaley's testimony. Dr. Whaley readily admitted that he was not qualified to testify about the standard of care for neurosurgeons generally. He just thought he could do so as to some things, including the issue in this case. Like the surgeon in *Cleveland*, *supra*, Dr. Whaley claimed

16

that he could offer opinions on the standard of care in another specialty simply because his own work occasionally brought him into contact with that specialty. Consistent with *Cleveland* and other decisions of this Court and the Supreme Court, we hold that the trial judge did not abuse his discretion by limiting Dr. Whaley to his actual area of expertise.

### III. Knight waived any objection to allegedly "undisclosed opinions" offered by Dr. Eckman at trial.

¶35. Knight also argues that she is entitled to a new trial because Dr. Eckman gave new and previously undisclosed opinions at trial. At trial, Dr. Eckman testified that if a misplaced pedicle screw had been the cause of Knight's pain, then Dr. Humphreys would have noted irritation and "monitoring issues"[7] when he removed the screws from Knight's pedicles in 2010. Yet, Dr. Humphreys's operative report noted "no irritation" and "no monitoring issues." Prior to trial, Dr. Clark disclosed that Dr. Eckman would testify that the allegedly misplaced screw was not the cause of Knight's pain and that he would rely in part on Dr. Humphreys's records. Nonetheless, Knight argues that Dr. Eckman's trial testimony was improper because there was no specific disclosure of the conclusion that Dr. Eckman drew from these specific notes in Dr. Humphreys's operative report. In response, Dr. Clark argues that Knight waived this issue by failing to object at trial and that Dr. Eckman's opinions on causation were adequately disclosed. We agree with Dr. Clark on both counts.

¶36. First, Knight did not object to Dr. Eckman's testimony at trial. Therefore, Knight waived the issue, and it is procedurally barred on appeal. *Canadian Nat'l/Ill. Cent. R.R. Co.*

---

[7] Dr. Eckman testified that Dr. Humphreys used "neuromonitoring" to detect signs of irritation or injury to the nerve.

17

*v. Hall*, 953 So. 2d 1084, 1096-97 (¶42) (Miss. 2007).

¶37. Knight argues that she preserved this issue by arguing in general terms during the pretrial conference that Dr. Clark and Dr. Eckman should not be allowed to give new opinions at trial. In response to Knight's argument, the court asked defense counsel whether either witness "planned on changing any of [his] testimony from the deposition." Defense counsel answered, "Not to my knowledge, Your Honor." The exchange did not produce any specific or definitive in limine ruling or order. But even if it had, Knight still would have been required to object to Dr. Eckman's testimony at trial. If during trial a "party violates the terms of [a pretrial in limine] ruling, objection must be made when the evidence is offered to preserve the claim of error for appeal." M.R.E. 103 advisory committee note. This is because "[t]he error, if any, in such a situation occurs only when the evidence is offered and admitted." *Id.*; *accord, e.g.*, *United States Aviation Underwriters Inc. v. Olympia Wings Inc.*, 896 F. 2d 949, 956 (5th Cir. 1990); *United States v. Roenigk*, 810 F. 2d 809, 815 (8th Cir. 1987). A contemporaneous objection was necessary here because the trial judge was in no position to know which of Dr. Eckman's opinions had been disclosed prior to trial. Knight had that knowledge, and it was incumbent upon her to raise the issue contemporaneously. By failing to do so, she waived the issue.

¶38. Knight also argues that she preserved the issue by later cross-examining Dr. Eckman as to whether he "ever express[ed] to anybody that [he] found significance in that part of Dr. Humphreys's report before [trial]." However, this was not a timely objection, as the allegedly improper testimony came significantly earlier during direct examination. Indeed,

18

this was not an "objection" at all. It was just a question of a witness. *See* M.R.E. 103(a) ("A party may claim error in a ruling to admit . . . evidence only if . . . a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground . . . ."). Therefore, we must again conclude that Knight failed to make a timely objection and failed to preserve this issue for appeal. *Hall*, 953 So. 2d at 1096-97 (¶42).

¶39. Moreover, the trial judge would not have been required to exclude Dr. Eckman's testimony even if Knight had made a timely objection. A party may use interrogatories to require an opposing party "to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." M.R.C.P. 26(b)(4)(A)(i). However, "[w]e have stated that 'discovery responses regarding experts do not, indeed cannot include everything that an expert witness will state at trial.'" *Walker v. Gann*, 955 So. 2d 920, 928-29 (¶24) (Miss. Ct. App. 2007) (quoting *Peterson v. Ladner*, 785 So. 2d 290, 295 (¶20) (Miss. Ct. App. 2000)). Prior to trial, Dr. Clark disclosed that Dr. Eckman would testify that the allegedly misplaced screw was not the cause of Knight's pain, that non-union of her fusion was the most likely cause of her pain, and that his opinions were based in part on Dr. Humphreys's records. Knight's only objection on appeal is that there was no specific disclosure that a few specific lines of those records supported Dr. Eckman's (disclosed) opinions. On these facts, even if Knight had timely objected, the trial judge would have been within his discretion to conclude that there was no "trial by ambush" and allow the testimony. *See Peterson*, 785 So. 2d at 296 (¶23).

¶40. In summary, Knight waived this issue by failing to object to Dr. Eckman's testimony

19

at trial. In addition, even if she had objected, the trial judge would have been within discretion to allow the testimony.

## CONCLUSION

¶41. There is sufficient evidence to support the verdict, the verdict is not against the overwhelming weight of the evidence, and no other reversible error occurred during trial. Therefore, we affirm the judgment entered on the jury's verdict.

¶42. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ.**

**WESTBROOKS, J., DISSENTING:**

¶43. I am of the opinion that the trial court improperly denied the Knights' JNOV motion or motion for a new trial after the jury answered a special interrogatory that Dr. Clark had not deviated from the standard of care. Therefore, I respectfully dissent.

## FACTS AND PROCEDURAL HISTORY

¶44. Beverly had a history of back pain. She testified that she began experiencing back problems in 1999 and underwent surgery for a bulged disc.[8] Beverly stated that her recovery was quick and easy and that she was back to "full speed" after the surgery, resuming her normal activities. In 2006, Beverly began experiencing back pain again. Her primary-care physician treated her with some medicine and referred her to Dr. Clark. Beverly began seeing Dr. Clark in January 2007. Beverly complained of lower-back pain, as well as

---

[8] Dr. John Hackman in Montgomery, Alabama performed the surgery.

numbness and tingling in her right leg.

¶45. In February 2007, Dr. Clark recommended that Beverly undergo a transforaminal lumber-interbody fusion (TLIF)[9] at the L5-S1nerve-root level. To accomplish the fusion during this surgery, two rods are placed lengthwise on either side of the spine and attached with screws into the pedicle bones[10] of the spine. This bracing provides stability, while a small metal cage with bone-growth material is placed between the vertebra to facilitate new bone growth and fusion of the spine. Beverly accepted the recommendation and had surgery on February 20, 2007. Beverly testified that immediately after the surgery, she began experiencing new pain in her left leg; whereas, she had previously only been experiencing pain in her right leg. Dr. Clark informed the Knights that Beverly just had major surgery and they needed to give her time to heal after surgery. On February 28, 2007, because she was experiencing excruciating pain, Beverly returned to Dr. Clark prior to her scheduled post-surgery appointment. During that visit, Beverly complained of severe pain in her left leg. Dr. Clark testified that her pain was much better but she was taking "really major narcotics." He also testified that he increased her pain medication. Beverly was taking Fentanyl, a very strong narcotic, and supplementing it with Percocet. Dr. Clark also prescribed Gabapetin—a nerve medication.

¶46. In March 2007, Beverly returned to Dr. Clark and informed him that she was still in

---

[9] The bony vertebrae are fused together in the lower back during this surgery to provide stability to the spine and alleviate pain.

[10] The pedicle bone surrounds the spinal canal, which contains the spinal cord and nerves that spread out at different levels.

excruciating pain. As a result, Dr. Clark prescribed physical therapy. In April 2007, Beverly returned to Dr. Clark and complained of numbness and tingling in both feet. Dr. Clark noted that after this visit he prescribed Neurotin and that by May 2007, Beverly appeared to be successfully progressing. Beverly returned to work and could bear weight on her legs three to four hours a day. In August 2007, Beverly was reported as being between eighty and eighty-five percent better in her right leg; however, she was still having trouble with pain in her lower back, left leg, and ankle. This was Beverly's last visit with Dr. Clark though she continued to call him for pain medicine prescriptions until January 2009.

¶47. In 2008, the Knights moved to Tennessee, and Beverly began being treated by Dr. Richard Moody, a general medicine practitioner, for her leg and back pain. Dr. Moody sent Beverly to Dr. Stephen Dreskin, a pain management physician, who ordered diagnostic testing because of her pain. Beverly underwent an MRI, which reported "no apparent nerve root compression identified" in the L5-S1 area. The test also revealed "sequelae from prior surgery at the level of L5-S1 noted with bilateral fixation rods in place. . . . Associated susceptibility artifact noted in this region." In 2009 in furtherance of her treatment, Beverly underwent another MRI performed by radiologist, Brett Alston. That test revealed no apparent spinal stenosis and no nerve root compression.

¶48. In 2010, Dr. Dreskin referred Beverly to Dr. S. Craig Humphreys, an orthopedic surgeon. According to Beverly's testimony, Dr. Humphreys performed a plain x-ray and explained to her that one of her screws was pointing different than the rest of the screws. Dr. Humphreys maintained that the L5 pedicle screw was touching the nerve root and causing

the pain in Beverly's left leg. Dr. Humphreys' medical records noted that there was fusion at L5 and S1, as well as medial misplacement of the pedicle screw. As a result, the pedicle screws were removed in August 2010 and Beverly remained under Dr. Humphreys' care.

¶49. In 2011, Beverly also sought treatment from a spine specialist, Dr. Diana Sodiq with the Emory Spine Center, who also found "incomplete bony fusion at the L5-S1 level." Shortly after, Beverly had a permanent electric-nerve stimulator implanted to alleviate some of her hip and leg pain. She also testified that the implant did not alleviate the pain and that the permanent damage had already been done.

¶50. Later in 2011, Beverly filed suit for medical negligence against Dr. Clark for failing to recognize, remove, and correct the misplaced pedicle screw. Her husband, Keith, joined the lawsuit with a claim of loss of consortium. During the trial, the Knights put forth the testimony of two experts: Dr. Martin Cooper, a neurosurgeon, and Dr. Dennis Whaley, a neuroradiologist. Dr. Clark testified in his own defense and presented Dr. Walter Eckman as his expert neurosurgeon.

### A.    Dr. Martin Cooper: Beverly's Neurosurgeon

¶51. Dr. Martin Cooper testified (via deposition) that the fluoroscopy films taken during Beverly's surgery in 2007 showed that the pedicle screw at L5-S1 was incorrectly angled into Beverly's spinal canal. As a result, Dr. Clark should have recognized the misplacement, removed the screw, and corrected it. But, Dr. Cooper testified that Dr. Clark never recognized the misplacement. More importantly, Dr. Clark never pursued any diagnostic testing for Beverly thereafter. Dr. Cooper expressed that when [Beverly] awoke from her

surgery with a new symptomology Clark was obligated to find the source of that, but he did not. He further surmised that he could not agree that Knight got better after the surgery because four months later Clark increased her medication for severe leg pain. He also disagreed with Dr. Clark that it would have taken two years for Knight to get better. Finally, Dr. Cooper stated that the screw could not have migrated into a misplaced position if it had been correctly lodged in the pedicle. He opined that the screw was misplaced from the very beginning.

### B. Dr. Dennis Whaley: Beverly's Neuroradiologist

¶52. Dr. Dennis Whaley presented a power point of Beverly's diagnostic images. He displayed to the jury images of the left pedicle screw from the time of placement until it was removed. The images confirmed that the screw was not in the pedicle and there was no migration. The images also displayed that the screw was not in the pedicle. The images also showed that the grossly malpositioned screw was not symmetrical with the other screws. According to Dr. Whaley the screw was "shooting way over to the right . . . [c]an't be in the pedicle." Last, regarding the 2009 MRI performed by radiologist Brett Alston, Dr. Whaley sharply disagreed with the finding that there was no root compression,[11] but you could clearly see there was compression. He opined that the pedicle screw hit the nerve dead center. He further explained that the nerve root around the left screw was swollen and thickened and that it was a fibrotic, abnormal, and damaged nerve root compared to the right nerve root, which was normally tiny and surrounded by fluid.

---

[11] Root compression is synonymous with the misplaced screw impinging on the nerve.

24

## C. Dr. Craig Clark

¶53. Dr. Clark testified in his defense and during his testimony he tried to cleverly misrepresent that the standard of care was "you would not *knowingly* leave a screw pressing on a nerve, so you would remove the screw." However, when asked again during cross examination, he agreed that "you would see if there were a breach, and if you saw a breach, you would either correct it with replacement of the screw or removal of the screw." However, Dr. Clark adamantly contended that the pedicle screw was not misplaced.

## D. Dr. Walter Eckman: Dr. Clark's Neurosurgeon

¶54. Dr. Walter Eckman debunked Dr. Clark's testimony. He testified that the screw was misplaced because it passed through a part of the spinal canal. Dr. Eckman also agreed that the screw did not migrate into the spinal canal. He further testified that if the screw had been properly placed as Dr. Clark purported, it would not have migrated. Dr. Eckman went on to say that the source of Beverly's pain was not misplacement of the pedicle screw but nonfusion. That explanation spoke to the issue of causation. Regarding the standard of care, he agreed with Beverly's experts that there is no violation relative to screw placement. When asked, Dr. Eckman said he was familiar with the standard of care regarding the performance of the [TLIF] surgery and the follow-up care and treatment. However, Dr. Eckman never elaborated on the standard of care. We acknowledge the separate opinion written by Judge Wilson, but it only supports that Dr. Eckman did not specify the standard of care. Dr. Eckman only offered testimony that "the standard is doing an appropriate procedure" and "he meets the standard of care better than I do."

25

**DISCUSSION**

¶55. Beverly asserts that the jury verdict answering the special interrogatory that Dr. Clark had not deviated from the standard of care was not supported by substantial evidence or in the alternative was against the overwhelming weight of the evidence. The Mississippi Supreme Court has previously held that:

> The standard of review for denial of a motion for judgment notwithstanding the verdict (JNOV) is de novo as to the law applied by the trial court judge as well as the evidence presented during trial. The legal sufficiency of the evidence, and not the weight of the evidence, is tested in a motion for JNOV. If there is substantial evidence in support of the verdict we will affirm the denial of the JNOV. Substantial evidence is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions. All evidence must be viewed by this Court in a light most favorable to support the verdict.

*Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 22 (¶3) (Miss. 2007) (citations and internal quotation marks omitted).

¶56. Moreover, "[t]he standard of review on a motion for a new trial is abuse of discretion." *Id.* at 23 (¶8). "The weight of the evidence, rather than the legal sufficiency, is tested in a motion for a new trial." *Id*. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*.

¶57. In order to establish a prima facie case for medical malpractice, the plaintiff has to show that:

> (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the

26

defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and; (4) the plaintiff was injured as a result.

*Cates v. Woods*, 169 So. 3d 902, 906 (¶11) (Miss. Ct. App. 2014).

¶58.    Both parties agreed that initial misplacement of the pedicle screw by the neurosurgeon is not a deviation from the standard of care. It was undisputed at trial that the standard of care requires the neurosurgeon to recognize, remove, and correct a misplaced screw. If the screw is misplaced during surgery as shown by film or some other source, the surgeon should immediately remove and replace it. If post-surgical symptoms indicate a potential problem, the surgeon should undertake diagnostic testing to ensure proper placement of the screw. Furthermore, the experts all agreed that a properly placed screw that goes through the pedicle bone with no invasion into the spinal cord will not migrate. Even Dr. Clark agreed with this assessment. During the surgery on February 20, 2007, Dr. Clark used a form of an x-ray called a fluoroscope to assist during the surgery. With the use of the fluoroscope, multiple quick images can be taken to see where the hardware is going. Dr. Clark testified that although it is not perfect, one uses it to assist, to guide, and to confirm placement. According to Dr. Clark, he viewed the fluoroscopy film at the conclusion of the surgery to confirm he initially placed the screw correctly.

¶59.    Dr. Martin Cooper testified that "when you use [the fluoroscopy] just in an AP or facing down . . . and a lateral view which is a side view—it's difficult to know where the tip of the screw is. We can tilt the machine to see actually where the screw is, not relying on just AP and lateral view." Dr. Cooper stated that the fluoroscope is not 100% accurate in

27

showing you where you are located. But, he also stated with the proper use of the fluoroscope during the surgery, it would have given Dr. Clark immediate information about the placement of the screw. As a result, Dr. Cooper opined that the deviation from the standard of care lies in not recognizing that a screw is misplaced. He maintained that the screw was placed into the actual spinal canal and the image showed that the screw was malpositioned. Dr. Cooper opined that with the use of the fluoroscope, it would have given the defendant immediate information about the placement of the screw. He also refuted Dr. Clark's position that the screw migrated because the 2007 and 2010 images showed the screw in the exact same place. Dr. Cooper also observed that the screw was impinging on the nerve causing Beverly's new pain in her left leg, hip, and numbness in her feet. Furthermore, Dr. Cooper opined that the negligence occurred when Beverly woke up from her surgery and had new pain she never experienced before. Finally, he noted that Dr. Clark described it as odd and aberrant that Beverly had these symptoms yet failed at any time to use any diagnostic studies in the form of a real X-ray, CT, or MRI, again breaching the standard of care.

¶60. Although Dr. Clark denied misplacing the screw, he admitted that it was not an ideal placement for the screw. Dr. Clark claimed that he used a ball probe and that the screws were in the bone and not impinging on a nerve. He also claimed that the screw must have migrated out of place. Even Dr. Clark's admission that the screw migrated subsequently implicates that the screw impinged on the nerve causing pain. Beverly's expert did not dispute that Clark used the ball probe to place the screw initially; however, that is not the

28

standard of care. Recognizing the misplacement, removing the screw, and correcting it is where Dr. Clark fell short.

¶61. Furthermore, Dr. Clark's own expert agreed that the L5 pedicle screw had been misplaced and was badly angulated. He also purported that Dr. Clark could not feel, see, or find the screw "because it was hidden from him by the position of the screw being so far medial." This confirms the misplacement was to such great a degree that Dr. Clark could not find it. This statement also contradicts Clark's assertion of confirming placement with the use of the fluoroscope. During his testimony, Dr. Eckman conceded that Dr. Clark passed the screw through a part of the spinal canal into the vertebral body and that the nerve was impacted. During Dr. Whaley's testimony, he stated that his expertise includes evaluating the nerve roots and to determine whether they are impinged or damaged. Again, he believed that Beverly had a chronically damaged fibrotic nerve root because it was being hit by the left pedicle screw. Further, Dr. Whaley stated that the images on the CT and MRI images showed that the pedicle screw at S1 was malpositioned on the left side.

¶62. Although Dr. Eckman agreed the screw had been misplaced, he insisted that Beverly's pain was caused by nonfusion, which would go toward the issue of causation, not duty,[12] and referred to the Emory medical records to support that contention. But he also testified that "you have to achieve solid fusion." He stated that while there is no fault in having a nonfusion, he is not happy until he achieves solid fusion (for his patients). Even so, nothing in Dr. Clark's records indicated that he ever considered nonfusion or that Dr. Clark

---

[12] *See McLachlan v. New York Life Ins. Co.*, 488 F.3d 624, 629 n.14 (5th Cir. 2007).

performed any follow-up diagnostic testing. Lastly, Dr. Humphreys's medical records rebuff Dr. Eckman's statement that there was no fusion between the L5-S1 nerve-root level as he reported there was fusion.

¶63. Dr. Clark testified that during Beverly's surgery, he made sure that he was placing the screws in the bone and not the spinal canal. Dr. Clark stated that he also placed the ball probe inside the spinal canal after he placed the screws to determine whether he saw a screw out of place. But, if that were so, his testimony would have been consistent with that of the other medical experts, including his own, Dr. Eckman. If the screw was misplaced so badly that he could not see it with the use of the fluoroscope, surely that should have at the least alerted Dr. Clark and lead him to recognize something was amiss. Inasmuch, he deviated from the standard of care. With the use of the fluoroscope at the conclusion of the surgery, Dr. Clark should have recognized the misplacement of the screw, removed it, and corrected it. Only his self-serving testimony purports that he correctly placed the screw. No other expert supported that testimony.

¶64. The Knights cite two cases[13] in their brief to support their position; however, I find the facts in *Samuels v. Mladineo*, 608 So. 2d 1170, 1178 (Miss. 1992), are similar to the present case. In *Samuels*, Barbara and Harold Samuels filed a malpractice action against Dr. Mladineo alleging "that Dr. Mladineo fell below the minimum standard of care in his tightening of the underlying tissues surrounding the vaginal wall, and in removal of an excessive amount of her vaginal wall [during a vaginal hysterectomy]." During trial, two

---

[13] *Blossman Gas Inc. v. Shelter Mut. Gen. Ins. Co.*, 920 So. 2d 422 (Miss. 2006); *White v. Yellow Freight Sys.*, 905 So. 2d 506 (Miss. 2004).

expert gynecologists testified that Dr. Mladineo removed too much of Barbara's vaginal wall during a hysterectomy. Drs. Boronow and Lee "[were] well qualified in th[e] specialized field of [vaginal hysterectomies]." *Id*. at 1181. Drs. Boronow and Lee were nationally recognized gynecologists. "Dr. Lee was generally considered to be one of the premier gynecological surgeons in the world." *Id*. at 1180. The trial "testimon[ies] of Drs. Mladineo, Boronow and Lee all agree[d] that if [Barbara]'s problem arose from surgical removal of an excessive amount of her vaginal wall and suturing the surrounding tissue too tightly, [which] would be negligence." *Id*. The experts agreed that Dr. Mladineo's removal of too much of Mrs. Samuels's vaginal wall and suturing the surrounding tissue too tightly coupled with scar tissue development caused Mrs. Samuels's pain and inordinately small vaginal space. *Id*. at 1181.

¶65. During trial, Dr. Mladineo also testified that "when he was performing surgery he did not make her vagina too small." *Id*. "He also testified that at the conclusion of her surgery he made the customary bimanual examination with his hand and found the vagina satisfactory." *Id*. Dr. Mladineo also presented the expert testimony of Dr. Calvin Hull, a board certified gynecologist. Dr. Hull (like Dr. Eckman) testified that Dr. Mladineo performed the surgery competently. *Id*. at 1178. The jury returned a verdict for Dr. Mladineo. *Id*. at 1180. The Mississippi Supreme Court reversed the ruling and remanded for a new trial, holding that "[a] surgeon's memory, his recollection, that he performed every step of some particular surgery properly cannot withstand physical evidence to the contrary." *Id*. at 1182.

¶66.    In *Samuels*, "[t]here was no disagreement between the [experts] as to the surgical procedures and precautions which should be followed in a vaginal hysterectomy." *Id*. at 1181. *Samuels*, like the present case, is fact driven.  In this case, all experts agreed to the standard of care regarding the placement and the recognition of misplacement of pedicle screws.  However, Dr. Clark, much like Dr. Mladineo, relied on his own testimony to refute claims that he fell below the standard of care, yet, the physical evidence and testimony did not support his assertion that he correctly placed the screw (although, according to him, the placement of the screw was not ideal).  All of the experts agreed that the screw was badly angulated. Again, even Dr. Eckman could not dispute that the screw passed through part of the spinal canal into the vertebral body and impacted the nerve.  That alone gave a nod to the plaintiffs' experts that the badly angulated or misplaced screw impacted or impinged on the nerve.

¶67.    Therefore, after review of the record, I would find that the case should be reversed and remanded in accordance with the holding in *Samuels* because Dr. Clark's memory and recollection that he performed every step of the TLIF surgery properly cannot withstand testimony and physical evidence to the contrary.  I acknowledge that the jury found that Dr. Clark did not violate the standard of care; however, that finding has to be weighed against the totality of the evidence presented.  Accordingly, I am of the opinion that the verdict overwhelmingly contradicts the weight of the evidence and to allow it to stand would sanction an unconscionable injustice.

¶68.    Therefore, I respectfully dissent.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**